**Fernando RUBALCABA, Pauline Rubalcaba, and Cigna Insurance Company of Texas, Appellants,**

v.

**Gottfried KAESTNER, M.D., Walter R. Sassard, M.D., Brodsky, Kaestner & Sassard, P.A., Kaestner, Sassard, Scarpino & Finkel, P.A., George Reul, M.D., and St. Luke's Episcopal Hospital, Appellees.**

No. 01–95–01016–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 17, 1998.

Rehearing Overruled Nov. 23, 1998.

Gary A. Scarzafava, Daniel Garcia, Annelie Meneke, L.T. Bradt, Corwin L. Teltschik, Les Cochran, Houston, for appellants.

Jack G. Carnegie, Laverne Carol Chang, Thomas J. Kerr, John R. Shepperd, Keith Dubanevich, Brian P. Johnson, Larry Dale Hatley, William N. Wilson, John Roberson, Houston, for appellees.

Before COHEN, O'CONNOR and ANDELL, JJ.

## OPINION

ANDELL, Justice.

This is an appeal from take-nothing summary judgments rendered in favor of appellees, Gottfried Kaestner, Walter R. Sassard, Brodsky, Kaestner & Sassard, P.A., Kaestner, Sassard, Scarpino & Finkel, P.A., and George Reul (the doctors), and St. Luke's Episcopal Hospital, in a medical malpractice action brought by appellants, Fernando and Pauline Rubalcaba and intervenor, Cigna Insurance Co. We affirm.

### Factual & Procedural Background

Fernando Rubalcaba injured his back at work and sought medical treatment from an orthopedist, Gottfried Kaestner. After diagnostic scans revealed problems with Rubalcaba's spinal discs, Kaestner scheduled surgery. Other tests available before the operation showed Rubalcaba had a calcified aorta, no pedal pulses in his left leg, and had suffered earlier heart attacks. Kaestner allegedly did not review these tests nor order a preoperative cardiovascular workup. Kaestner also elected to make his incision through the front, rather than the back,

which required him to retract the aorta. Kaestner operated with the assistance of George Reul and Walter Sassard. Rubalcaba had expected only Kaestner to operate.

The surgery itself was apparently unremarkable; hours later, however, as a result of a clot in his femoral artery, Rubalcaba lost circulation in his left leg. This condition necessitated emergency surgery. Over the next 18 months, Rubalcaba underwent nine more surgeries as his doctors attempted to restore circulation and function to the leg. After each operation, he was left increasingly debilitated. Rubalcaba was not happy with his care and began to make inquiries. The hospital and doctors did not respond to many of Rubalcaba and Cigna's initial attempts to obtain medical records. When complete records were finally obtained, it was evident they had been tampered with.

Rubalcaba sued the doctors and the hospital, and Cigna intervened. All of the defendants moved for summary judgment, based on limitations. Rubalcaba then amended his petition, claiming that (1) the defendants fraudulently concealed his medical records from him, thereby preventing him from discovering his injury and (2) the defendants did not negate the "open courts" doctrine. The trial court rendered summary judgment for all defendants. Cigna nonsuited its claims for wrongful billing and joined Rubalcaba in this appeal.

Rubalcaba contends the trial court erred in finding that the claim was barred by limitations because: (1) the fraud claims are not governed by article 4590i;[1] (2) the defendants did not negate the "open courts" doctrine; and (3) he raised fact issues regarding fraudulent concealment. Cigna complains of the same errors and further contends the defendants did not establish the date the tort occurred, establish the last date of hospitalization, or negate the "continuous course of treatment" defense.

## Standard of Review

Summary judgment is proper only when the movant shows that there is no genuine issue of material fact and that it is entitled to

judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); TEX.R.CIV.P. 166a(c). For a defendant to prevail on a motion for summary judgment, it must either: (1) disprove at least one element of the plaintiff's cause of action; or (2) plead and conclusively establish each essential element of an affirmative defense to the plaintiff's cause of action. *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984); *Casey v. Methodist Hospital,* 907 S.W.2d 898, 900 (Tex.App.—Houston [1st Dist.] 1995, no writ).

Once a movant has produced competent evidence to establish a right to summary judgment, the burden shifts to the nonmovant to introduce evidence to raise an issue of fact that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Casey,* 907 S.W.2d at 900. In deciding whether there is a disputed issue of material fact, evidence favorable to the nonmovant will be taken as true. *Nixon,* 690 S.W.2d at 548–49. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Id.*

## Limitations

Appellees had to prove as a matter of law that the suit was barred by limitations. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex. 1983); *Casey,* 907 S.W.2d at 900. If the defendant conclusively establishes the defense of limitations and the plaintiff resists the summary judgment by asserting the affirmative defense of fraudulent concealment, the plaintiff must produce evidence of fraudulent concealment. *Nichols v. Smith,* 507 S.W.2d 518, 521 (Tex.1974); *Casey,* 907 S.W.2d at 901–02.

*Applicability of Article 4590i*

■ As a threshold matter, Rubalcaba contends his "fraud" claims are not governed by article 4590i. We do not agree. The relevant definitions are:

"Health care" means any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of

---

1. TEX.REV.CIV.STAT.ANN. art. 4590i, § 10.01 (Vernon Supp.1998).

a patient during the patient's medical care, treatment, or confinement.

"Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.03(a)(2), (4). Rubalcaba's claim is for fraudulent concealment, not fraud, and is a defense to limitations, not an independent cause of action. It is governed by the Act.

As a second threshold matter, Cigna contends in point of error 16 that article 4590i does not apply to professional associations of physicians. However, this Court has held that professional associations are covered by the Act. *Campbell v. MacGregor*, 966 S.W.2d 538, (Tex.App.—Houston [1st Dist.] writ requested) (op. on rehg).

*Date From Which Limitations Ran*

■ The applicable statute of limitations is found in article 4590i, § 10.01, which provides:

> Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed. . . .

Thus, under section 10.01, the statute of limitations begins to run from one of three possible dates: (1) the date of the occurrence of the breach or tort; (2) the date the health care treatment that is the subject of the claim is completed; or (3) the date the hospitalization for which the claim is made is completed. *Kimball v. Brothers*, 741 S.W.2d 370, 372 (Tex.1987); *Casey*, 907 S.W.2d at 901. Although the statute specifies three dates from which the limitations period may run, a plaintiff cannot simply choose among any of these dates. *Kimball*, 741 S.W.2d at 372 (Tex.1987). If the injury results from a negligent course of treatment, rather than a specific instance of negligence, the limitations

period begins on the last date of treatment. *Id.* However, when the precise date of the breach or tort is ascertainable, the limitations period begins on that date. *Id.; Casey*, 907 S.W.2d at 902.

Although Rubalcaba received home health care as late as November 1993, his complaints center solely on the first surgery performed on June 3, 1991. In his fourth amended (live) pleading, each act of medical negligence alleged—misdiagnosis, failure to obtain informed consent, performing unauthorized and unnecessary surgery, and mistreatment—relates exclusively to that initial surgery on June 3, not to any other medical treatment. Although Cigna contends the defendants were required to establish the last day of hospitalization and to negate the "continuing course of treatment" defense, they did not need to do either because the date of the tort was ascertainable. *See Kimball*, 741 S.W.2d at 372; *Casey*, 907 S.W.2d at 902. Treatment following surgery does not extend the statute of limitations when the complaint concerns the initial surgical procedure. *Marchal v. Webb*, 859 S.W.2d 408, 417 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

■ Rubalcaba and Cigna further contend that, even though the complaints center upon events that occurred solely on June 3, 1991, the date of the tort was not readily ascertainable because the doctors and St. Luke's refused to provide them with a complete copy of the medical records until after Rubalcaba filed suit. In his response opposing summary judgment, Rubalcaba attached the affidavits of his attorney and expert witnesses stating that an examination of Casey's medical records was necessary to determine if and when medical negligence happened.

According to TEX.REV.CIV.STAT.ANN. art. 4590i, § 4.01(d) (Vernon Supp.1998), all parties are "entitled to obtain complete and unaltered copies of the claimant's medical records from any other party within 10 days from the date of receipt of a written request for such records." In addition, Cigna had a statutory right as a workers' compensation insurer to obtain the records. TEX.REV.CIV. STAT.ANN. art. 8307, § 10 (Vernon 1997). Rubalcaba and Cigna did not obtain full and

complete hospital, physician, and home health care records[2] until February 1995. Although the defendants were required by statute to provide Rubalcaba and Cigna with a copy of all medical records, their failure to do so did not toll the statute of limitations because the injury occurred on a specific, ascertainable date—June 3, 1991. *See Casey,* 907 S.W.2d at 903; *James v. Persona Care of San Antonio,* 954 S.W.2d 113, 114 (Tex.App.—San Antonio 1997, no writ).

Nor did their delay cause the statute of limitations to begin to run from the date of Rubalcaba's hospital discharge or the last date of his treatment. *Casey,* 907 S.W.2d at 903. Whatever relief may be afforded to a party when a health care provider fails to timely provide a copy of the party's medical records, the failure does not allow the two-year statute of limitations to run from the last date of treatment or the date of the hospital discharge when the injury occurred on a date certain. *Casey,* 907 S.W.2d at 904. Article 4590i does not provide for an additional tolling period in the event a defendant does not comply with sec. 4.01(d) of the Act by not providing records. *James,* 954 S.W.2d at 114.

As a matter of law, Rubalcaba and Cigna's claims against the doctors and the hospital are based on acts or omissions that occurred on June 3, 1991. Therefore, this is the date that limitations on the claim began to run. *Kimball,* 741 S.W.2d at 372; *Casey,* 907 S.W.2d at 903. When a party gives notice of his or her claim to a health care provider before the expiration of the two-year limitation period, the statute of limitations is tolled for 75 days from the date of the notice. Tex.Rev.Civ.Stat.Ann. art. 4590i, § 4.01(c) (Vernon Supp.1998); *Rowntree v. Hunsucker,* 833 S.W.2d 103, 104–105 n. 2 (Tex.1992); *Casey,* 907 S.W.2d at 903. Rubalcaba first gave notice of his claim on October 23, 1993, four months and 20 days after limitations had expired, thus he was not eligible for the 75-day tolling period. He sued on December 21, 1993, six months and 18 days after limitations had expired.

We hold this claim was barred by the statute of limitations in article 4590i.

We overrule Rubalcaba's points of error one (a), two (a), three (a), and four (a), and Cigna's points of error one, two, three, six, seven, eight, 11, 12, 13, and 16.

## Defenses to Limitations

■ Limitations may be avoided if Rubalcaba can show either (1) it was impossible for him to have discovered his injury before limitations ran, or (2) the hospital and doctors fraudulently concealed from him a cause of action for malpractice. Rubalcaba contends both defenses to limitations are applicable.

### Open Courts Doctrine

■ The Texas Constitution provides, "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. 1, § 13. The statute of limitations under article 4590i may be challenged under the open courts provision. *Morrison v. Chan,* 699 S.W.2d 205, 207–08 (Tex.1985). However, it is incumbent on the party seeking to avoid limitations to plead facts showing it was *impossible* for him to have discovered his *injury* within two years. *Id.* at 207; *Marchal,* 859 S.W.2d at 418.

Rubalcaba cannot demonstrate it was impossible for him to have discovered his injury before limitations ran, thus he cannot avail himself of the open courts exception to limitations. In fact, he was aware of his injury on the day that it occurred. He knew he underwent emergency surgery for a blood clot and that his incision from the back surgery was far more extensive than he anticipated. In deposition testimony, he testified that, while he was still hospitalized in August 1991, he was "dissatisfied" with his care, "blamed" the doctors for his condition, and believed his doctors were "lying" to him.

Cigna contends Rubalcaba was not sophisticated enough to appreciate the nature of his injury, but Rubalcaba's deposition reflects he knew of his injury when he left the hospital in August 1991 and blamed his doctors for

---

**2.** Appellee St. Luke's provided the home health    care to Rubalcaba.

his condition. Although Rubalcaba argues his deposition was not properly translated, his language expert's affidavit shows only that the word "believe" should have been translated as "felt" in several instances. It does not alter the substance of the deposition testimony. Nor does Rubalcaba's affidavit directly contradict his deposition. Although he expressed some confusion over the course of treatment, and alleged he did not know he had a "cause of action" until his attorney told him he had one, he did not contradict or withdraw his earlier statements indicating he knew of his injury. Accordingly, the open courts exception is inapplicable here.

We overrule Rubalcaba's points of error one (b), two (b), three (b), and four (b), and Cigna's points of error four, nine, and 14

*Fraudulent Concealment*

■ Rubalcaba and Cigna further argue the defendants did not controvert the pleadings and proof of fraudulent concealment of his medical records, thus limitations should not bar his suit. Rubalcaba's fourth amended petition alleged that St. Luke's and the doctors fraudulently concealed from him the nature of his condition and its probable cause by failing to maintain his records in a lawful and proper manner and by not informing him of (1) the injury and damages he had sustained, (2) the persons involved in the injury, and (3) his prognosis and level of permanent damage. Rubalcaba is a migrant worker who speaks only Spanish and who left school in Mexico after the first grade, thus he contends his understanding of his condition was not on a par with a more sophisticated patient.

■ Fraudulent concealment is an equitable doctrine that, when properly invoked, estops a defendant from relying on the statute of limitations as an affirmative defense to a medical malpractice claim when a defendant is under a duty to make disclosure, but fraudulently conceals the existence of a cause of action from the plaintiff. *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983); *Casey,* 907 S.W.2d at 903. The defendants deny they committed malpractice, and argue they had nothing to disclose to Rubalcaba. Once a defendant has conclusively established the affirmative defense of limitations, the burden

rests with the plaintiff to provide evidence of specific facts demonstrating actual knowledge of a wrong and a fixed purpose to conceal it. *Casey,* 907 S.W.2d at 903; *Arredondo v. Hilliard,* 904 S.W.2d 754, 759 (Tex. App.—San Antonio 1995), *rev'd on other grounds sub nom. Baptist Memorial Hosp. Sys. v. Arredondo,* 922 S.W.2d 120 (Tex. 1996).

As in *Casey* and *Arredondo,* Rubalcaba and Cigna's efforts to obtain complete records were repeatedly ignored, resisted, or frustrated by the appellants, even after Cigna engaged a nurse whose sole function was to obtain and examine the records. The clerk's record shows St. Luke's provided the bulk of the hospital records (roughly 900 of 1200 pages) to Rubalcaba and to Cigna in October 1991. On October 8, 1993, after a discharge summary was prepared, the hospital permitted Mary Toney to examine the records. She discovered an additional 300 pages of hospital records that day, but neither party has identified which portions of the record were not originally supplied or which of these additional records were necessary to determine if there was negligence. Toney also testified that in February 1995 she found additional hospital records, alterations to the hospital record, and St. Luke's home health care records.

Reul's records custodian, Velma Garcia Moreno, swore in an affidavit she provided Rubalcaba's records to Cigna in January 1992 and September 1992, including Reul's post-operative summary of the June 1991 surgery, and that Rubalcaba did not request these records until October 1993. Kaestner's records custodian, Susan Cummins, swore in an affidavit that she sent all requested records to Cigna and Rubalcaba in 1991, including Kaestner's post-operative summary of the June 3, 1991 surgery, transcribed on June 7, 1991. Cummins swore she sent each record shortly after it was transcribed.

■ Rubalcaba and Cigna offered five affidavits setting out in detail the lengths to which they went to obtain records, their attendant lack of success, the changes made to the records, and the consequences of not

having been able to obtain the records in a timely manner:

(1) an affidavit from Rubalcaba, stating his doctors "reassured" him that his care was proper, and contending they never informed him of his injury, the person(s) responsible, the extent of his disability, or its permanence.

(2) an affidavit from Dr. James Sturm, plaintiff's medical expert, stating it would be "impossible" to determine whether medical malpractice occurred without having complete records to review. Sturm also testified Rubalcaba's injuries were of a type that the physicians immediately knew had occurred, and how.

(3) an affidavit from James Massey, M.P.H., plaintiff's hospital administration expert, stating that if a hospital does not timely complete a medical record, it is impossible for a patient or his representative to determine what treatment the patient received. He notes the hospital did not provide a "completed" medical record until October 8, 1993.[3] Massey notes that one of the purposes of medical records is to protect the legal interest of the patient. He concludes "it is ludicrous to assume that a patient can seek legal counsel to determine if an injury occurred, if there was a departure from standards, and if that departure caused the damages" without a complete record of care.

(4) an affidavit from Susan Dietrich, Cigna's workers' compensation claim representative, detailing the numerous thwarted attempts to obtain records from St. Luke's and Kaestner during August and September 1991.

(5) an affidavit from Mary Toney, a nurse hired by Cigna in 1993 to obtain and evaluate the hospital records, detailing her two-year effort to obtain complete records. Toney stated the hospital records she carefully marked for copying in October 1993 were not copied, and she was unable to obtain records from the doctors despite several requests. When Toney examined

the hospital records again in February 1995, she discovered additional records the hospital had not previously produced in October 1993, plus home health care records. She also noted numerous changes in Rubalcaba's medical records—changed dates, items crossed out, times not matching, pages filled out in pencil, numerous portions concealed with black marker, and corrections made without complying with standard practices.

As we must, we take as true Rubalcaba's summary judgment proof that the hospitals and doctors prevented him from obtaining full and complete records before February 1995. However, even if we assume the defendants were attempting to conceal malpractice by not providing the records, we are not persuaded that being unable to acquire his *records* meant Rubalcaba was unable to determine he had a *cause of action* for malpractice. For a party to invoke fraudulent concealment as a defense to limitations, he must show that the cause of action has been concealed, not that the records have been concealed. The inability to obtain medical records does not, in and of itself, establish fraudulent concealment. *Arredondo,* 904 S.W.2d at 758. Rather, it was Rubalcaba's burden to raise a fact issue on each element of fraudulent concealment of his cause of action for malpractice: (1) actual knowledge of malpractice, (2) a duty to disclose it, and (3) a fixed purpose to conceal it. *See Casey,* 907 S.W.2d at 903. In *Casey,* as here, the plaintiff alleged the hospital fraudulently concealed from her the nature of her condition and its probable cause, by failing to timely supply a copy of her medical records. 907 S.W.2d at 903. In support of her contentions, Casey attached the affidavits of her attorney and her expert witness, who stated the records were needed to determine when and if negligence had occurred. *Id.* Nevertheless, this Court rejected that argument and held the evidence did not establish the hospital had actual knowledge that a wrong occurred or a fixed purpose to conceal it. *Id.*

---

**3.** Massey's affidavit apparently relies on Mary Toney's statement that she did not obtain "complete" hospital records until October 8, 1993. However, Toney also testified she did not obtain "complete" records until February 1995, a claim Rubalcaba repeats in his brief to the Court. As stated, St. Luke's provided 900 pages of its records in October 1991.

We are faced here with the same argument, and must likewise reject it. Although we assume Rubalcaba's summary judgment evidence raises a material issue of fact on each element of fraudulent concealment, he still cannot escape limitations because the concealment must effectively prevent a party from learning he has a cause of action. Fraudulent concealment ceases to be a defense to limitations when a party learns of "facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action." *Borderlon*, 661 S.W.2d at 909. Knowledge of such facts is, in law, equivalent to knowledge of the cause of action. *Id.*

The record persuades us Rubalcaba knew he had a cause of action for malpractice. First, he knew he was injured. By the time he was discharged from the hospital to home health care in August 1991, Rubalcaba knew he had undergone not one, but two surgeries. He knew the surgery on his leg was not initially contemplated. Despite expecting only one surgeon to operate, he knew other doctors had assisted or performed surgery, and who they were. Second, he blamed his doctors and the hospital for his condition. His deposition clearly shows this:

Q: Okay. At the time you left the hospital in September, 1991, do you remember that time?

A: Yes, more or less.

Q: Do you remember noting that you had a scar on your stomach?

A: Yes.

Q: And did that upset you?

A: Oh yes, yes, it bothers me quite a bit.

Q: And that's because you thought the surgery was going to be on your back and not your stomach; is that right?

A: Yes.

Q: So you felt at that time that Dr. Kaestner had misrepresented things to you?

A: Yes. He told me lots of lies.

Q: And you knew that when you left the hospital in September, 1991?

A: Yes.

. . . .

Q: Okay. So you felt at the time you left St. Luke's Hospital in September, 1991 that Dr. Kaestner had done you wrong?

A: Yes.

Q: Okay. You felt in September, 1991 when you left St Luke's Hospital that Dr. Kaestner had not represented the truth to you?

A: Yes.

Q: All right. Now, you understood when you left the hospital in September, 1991 that there were other doctors besides Dr. Kaestner that had cared for you?

A: Yes.

Q: And you felt that those doctors along with Dr. Kaestner had done you wrong?

A: Yes.

Q: And for that matter, you felt that the hospital personnel had done you wrong?

A: Yes.

Q: Especially because the hospital personnel were involved with your care?

A: Yes.

. . . .

Q: In September, 1991 when you left St. Luke's Hospital, you knew that Dr. Kaestner and the other doctors you have sued and St. Luke's Hospital had deceived you?

A: Yes.

Q: And that was knowledge you had when you left the hospital in September, 1991?

A: Yes, because of what they had done. I didn't imagine it, what they had done to me.

. . . .

Q: In September, 1991 when you left St. Luke's hospital, you felt Dr. Kaestner, the other doctors you've sued in this lawsuit and St. Luke's Hospital were to blame for the complaints you have alleged in this lawsuit?

A: I believe they are to blame.

Q: Uh-huh. And that was your opinion back in September, 1991 when you left St. Luke's Hospital?

A: I didn't believe I would have come out like this.

Q: Okay. So you felt they were to blame in September, 1991 when you left the hospital?

A: Yes.

Third, Michael Giblin, a Cigna claims specialist testifying as the company's records custodian, explained the notations made in Rubalcaba's insurance file as follows:

Q: If you'll look at the September 5, '91 entry, on that date, there's a comment being made that "Continued rehab is expected. Return to work not expected. Subro will be involved, as the plaintiff attorney is expected to file a med malpractice suit against the treating physician." Is that what it says?

A: Yes, it does.

Q: What does it mean that "subro will be involved"?

A: If we—if an adjustor believes that there is any type of third party involvement, we have a separate department that we refer all of the cases to for their review. And this—this adjustor apparently felt that there was some kind of third party involvement out there, and he's implying that they are going to refer that to them for review.

Q: Meaning that the subrogation that CIGNA has filed in this case was at least being contemplated as of September 1991?

A: According to what it says there.

Q: And that's because the plaintiff's attorney was expected to file a medical malpractice suit?

A: That's what it says.

. . . .

Q: The entry of January 13, 1992, it says "claimant still apparently researching possibility of med mal. Two attorneys

have rejected case. Another is now reviewing." Is that correct?

A: That's correct.

This evidence satisfies us that Rubalcaba knew both of his injury and of his cause of action for malpractice before he even attempted to obtain his records. At the least, it shows knowledge of "facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action," thus ending the estoppel effect of fraudulent concealment. In addition, despite his claim that he could not sue until he could determine from his *complete* records if he had a cause of action for malpractice, Rubalcaba did just that—he sued in December 1993, before Toney had obtained the full and complete records in February 1995.

The necessity of filing an expert medical opinion within 180 days of filing suit in a medical malpractice action under article 4590i is a stringent requirement, but it is up to the legislature to address what penalties it will impose when providers withhold records. Even in a medical malpractice action, a party cannot wait to file suit until his attorney tells him he has a cause of action, and thereby avoid limitations. *LaGesse v. Primacare, Inc.*, 899 S.W.2d 43, 45 (Tex.App.—Eastland 1995, writ denied); *Adkins v. Tafel*, 871 S.W.2d 289, 294 (Tex.App.—Fort Worth 1994, no writ). Had Rubalcaba sued before limitations ran, and still been unable to obtain his records, he could have invoked the power of the court to avail himself of various remedies.[4]

We overrule Rubalcaba's points of error one (c), two (c), three (c), and four (c), and Cigna's points of error five, 10, and 15.

We affirm the judgment.

Justice COHEN concurring.

Justice O'CONNOR dissenting.

COHEN, Justice, concurring.

I believe that appellant had the burden of production on the issue of fraudulent conceal-

---

4. He could have sought an injunction, moved to compel production, had the records subpoenaed, or obtained an extension of time to file his experts' opinions.

ment and because he did not meet it, he cannot prevail.

When, as here, defendants conclusively establish the defense of limitations, a plaintiff, in order to avoid summary judgment, must produce evidence of fraudulent concealment. *Nichols v. Smith,* 507 S.W.2d 518, 521 (Tex. 1974). Fraudulent concealment is a form of equitable estoppel. *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983). To benefit from the doctrine, a plaintiff must show that the concealment harmed him, that is, it kept him from suing within the period of limitations. *Id.* Appellant has not shown that.

Appellant received 900 pages of records from St. Luke's in October 1991, twenty months before limitations expired. He was represented by counsel then, as he was long before surgery and at all times after surgery.[1] He complains that 300 more pages of St. Luke's records were not furnished until shortly before and after limitations expired. However, appellant has not shown that the late records support his claim. He has not identified one page of any late supplied record and stated that if he had it sooner, he would have sued sooner. Appellant has not shown that the late supplied records even related to the conduct he complains of, the doctors' alleged negligence on June 3, 1991.

Appellant claims he needed "all" records of his treatment, including those for five months afterward, to know of his injury. When, as here, all damages flow from negligence on June 3, 1991, that claim cannot be correct. If, as the cases say, the plaintiff must produce evidence of fraudulent concealment, what must he produce? The answer, I think, is evidence that the concealment kept him from suing earlier. Thus, appellant needed to show that the concealed evidence supported his claim that defendants were negligent on June 3 and the concealed evidence differed from the revealed evidence. If the concealed evidence did not pertain to June 3,

1991, its concealment was irrelevant. If the concealed evidence did not support appellant's claim, its concealment was not fraudulent. If the concealed evidence did not differ from the existing evidence, its concealment was harmless.[2]

Appellant's medical expert on malpractice was James Sturm, M.D. He stated:

... A proper pre-operative evaluation would have included a consultation by a specialist in internal medicine or cardiology to properly, and in an orderly fashion, evaluate plaintiff's cardiovascular condition and risk of undergoing general anesthesia ...

... Evidence of the old myocardial infarction dictated that plaintiff's cardiovascular function be appropriately evaluated prior to his undergoing general anesthesia. Had Mr. Rubalcaba been so evaluated prior to the first surgery, he would not have suffered the vascular complications which occurred during and following the first surgery.

Based upon a medical certainty, it would be impossible to determine whether or not medical malpractice occurred in the care of Mr. Rubalcaba without having Mr. Rubalcaba's St. Luke's records available for review. This is because the records from the defendant doctors' offices do not contain the complete records of Mr. Rubalcaba's hospitalizations at St. Luke's. Without an opportunity to review the facts of the case as they are memorialized in the hospital record, it would not be possible to discern if there had been a deviation from the standard of care. It would be necessary to review *the hospital records* including, but not limited to, *the history and physical reports of operations, doctors' progress notes, nurses' notes, anesthesiology rec-*

1. At least two attorneys represented appellant long before limitations ran, Benito Pena and Patrick Gailey, and both spoke with Cigna about suing for medical malpractice. Cigna's records also show that Mr. Pena "will refer claimant to attorney Jim Purdue who specializes more in these types of cases."

2. At trial, such evidence might add weight to similar evidence of negligence or might increase punitive damages for unethical or illegal conduct. By "harmless" in this context of limitations, I mean that it would not tell the plaintiff something new that would encourage him to sue earlier.

*ords, consultation notes, and respiratory therapy notes.*

(Emphasis supplied).

Appellant does not contend that the records listed by Dr. Sturm were supplied late. He does not contend the records listed by Dr. Sturm were *not among* the 900 pages St. Luke's furnished in October 1991. He does not contend the late supplied records showed the defendants were negligent on June 3, 1991. He does not contend the same facts were *not shown* by earlier supplied records. Without such proof, appellant has not met his burden to produce evidence of a *material* fact issue.

The dissenting opinion labels the late supplied "discharge summary for the June 1991 operation" as "the most important of the records for determining the possibility of malpractice." Dr. Sturm, who listed eight specific categories of "necessary" records, did not mention that record. Appellant now has it, but he does not claim it contains anything that would have influenced him to sue earlier.

The dissenting opinion asserts "... the defendants fraudulently concealed *the evidence that would prove their negligence,* which would indicate to the plaintiff that he should file a medical malpractice suit ..." Dissenting op. at 381 (emphasis in original). I think that is precisely what appellant has not shown, i.e., that records concealed showed negligence not shown by records timely revealed.

1. The panel opinion, authored by Justice Andell, resolves the two issues in this case holding: (1) the plaintiff carried his burden to show fraudulent concealment, and (2) even without the records the plaintiff should have known that he had a suit for medical malpractice. Justice Cohen concurs with the result of Justice Andell's opinion but disagrees that the plaintiff showed fraudulent concealment. I agree with Justice Andell that the defendants' fraudulently concealed the records, but I dissent from his conclusion that the plaintiff could have filed suit without the records.

2. The concurring opinion states that to defeat the motion for summary judgment, the plaintiff was required to show that the medical records that were concealed "kept him from suing within the period of limitations." The plaintiff made a sufficient showing of that through the affidavit of an

O'CONNOR, Justice, dissenting.

I dissent. The panel's opinion permits the health care providers to use the Medical Liability and Insurance Improvement Act (the Medical Act) as a shield to protect them from liability for their medical malpractice.[1] The lesson we taught the medical community in *Casey v. Methodist Hospital,* 907 S.W.2d 898 (Tex.App.—Houston [1st Dist.] 1995, no writ), was that a health care provider can hide a patient's medical records while the statute of limitations runs. In this case, we see that St. Luke's and its medical staff have learned and applied the lesson. We should reverse this case and overrule *Casey.*

Because this is a summary judgment case, we must assume the plaintiff's summary judgment evidence is true, even though contradicted by the defendants. Thus, the underlying premise in this appeal is the doctors and St. Luke's were negligent and their negligence caused the plaintiff's injury.[2]

**Background**

This suit involved a plaintiff who sustained an on-the-job injury and underwent a back operation, which was to be paid by Cigna, the employer's workers' compensation carrier. What began as an operation for a worker's compensation injury became a situation in which the carrier, as well as the plaintiff, accused the defendants of conspiring to hide and alter medical records. Cigna wanted the medical records to determine if it should pay

expert witness, Dr. James Sturm, who is both a medical doctor and a lawyer. In his affidavit, Dr. Sturm said:

> Based upon reasonable medical certainty, Plaintiff's injuries occurred as a result of a deviation from the acceptable standard of care.
> Based upon reasonable medical certainty, the injuries to Plaintiff were of a type that the Defendant physicians immediately knew had occurred and how they occurred....
> Based upon a reasonable medical certainty, it would be impossible to determine whether or not medical malpractice occurred in the care of Mr. Rubalcaba without having Mr. Rubalcaba's complete St. Luke's Hospital records available for review. This is because the records from the defendant doctors' offices do not contain the complete records of Mr. Rubalcaba's hospitalizations at St. Luke's.

all the expenses for the three month hospital stay, or if it was liable for only the costs associated with the back operation.[3] The plaintiff wanted the records to determine if he was injured as a result of medical malpractice. When suit was filed, both the plaintiff and Cigna claimed fraud on the part of the defendants.

In June of 1991, the plaintiff was admitted to the hospital for what was to be a simple back operation. Almost four months later, after six hospitalizations and eleven surgeries, and after having suffered progressive pulmonary edema, congestive heart failure, and acute kidney failure, the plaintiff was discharged with scars across his chest and from his chest to his ankle, and the loss of 70 percent of the muscles in his leg. Why had things gone so terribly wrong? The plaintiff understandably thought somebody did something wrong—most *back* operations do not leave the *front* of the patient's body crisscrossed with scars.

When the plaintiff asked what went wrong, one of the doctors assured him the treatment was necessary to save his life. He did not tell the plaintiff that the doctors had made mistakes in their treatment, including performing a dangerous and possibly unnecessary surgery, not checking the plaintiff's EKG or x-rays that indicated a calcified aorta and a history of cardia infarction, choosing to perform the surgery from the front, thus requiring them to shift the plaintiff's calcified aorta, clearing the plaintiff to leave intensive care even though he showed signs of restricted blood flow and other complications, and using an x-ray technician instead of a operating room nurse during the surgery. To compound the deception, the defendants then hid the plaintiff's medical records until after the statute of limitations had run.

Not only did the defendants hide, alter, and refuse to produce the medical records, they delayed completing the records until after the statute of limitations ran. Even the majority's opinion admits there was "exten-

sive evidence of concealment." The discharge summary for the June 1991 operation—the most important of the records for determining the possibility of malpractice— *was not even dictated until October 15, 1993,* two years and five months after the initial surgery, well after the statute of limitations had run. St. Luke's did not give the records to the plaintiff and Cigna until after the discharge summary was dictated, in October 1993, more than two years and five months after the initial surgery. Two months after receiving the records, in December of 1993, the plaintiff filed suit. However, even those records were not complete. When the plaintiff and Cigna finally secured the records, they found the records full of questionable deletions, mark-outs, and corrections. It was not until 1995 that the plaintiff and Cigna secured all of his medical records.

The majority holds that even if the records were hidden, the plaintiff must have known from the beginning that he had a cause of action against the defendants, and, for that reason, was not entitled to raise the affirmative defense of fraudulent concealment. Thus, the majority concludes, the two year statute of limitations barred the plaintiff's suit. I disagree.

### Defendants' Duty to Admit Their Negligence

When a doctor is negligent, the doctor has the duty to admit it. *Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex.1983). Because the doctor-patient relationship is one of trust and confidence, Texas recognizes a duty on the part of the doctor to disclose to a patient that an injury has occurred due to the doctor's negligence. *Id.* Failure to disclose negligence constitutes fraudulent concealment which prevents the wrongdoer from perpetrating further fraud by using limitations as a shield. *Id.*

The summary judgment evidence established that the defendants hid the fact of their negligence from the plaintiff and Cig-

---

**3.** Cigna intervened as a plaintiff and sued the defendants for (1) subrogation (in the event the plaintiff was successful in his suit against the defendants), (2) the recovery of money paid to the defendants for treatment which was not rea-
sonable or necessary or related to the plaintiff's workers' compensation injury, and (3) attorney fees. Cigna was not willing to cover the costs associated with the doctors' negligence.

na.[4] Thus, the defendants should not be able to rely on the statute of limitations to hide their breach of their duty to disclose their own negligence.

Section 13.01 of the Medical Act requires a plaintiff to provide expert reports outlining each defendant's liability within 180 days of filing a medical malpractice suit, or to non-suit any defendant about which the plaintiff does not file an expert report. TEX.REV.CIV. STAT. art. 4590i, § 13.01(d) (1998). Under section 13.01, a defendant is entitled to a dismissal with prejudice *and* sanctions if, within 180 days of filing suit, a plaintiff does not produce an expert report. TEX.REV.CIV. STAT. art. 4590i, § 13.01(e) (1998).

A plaintiff may suspect he has a cause of action for malpractice but, under the unique provisions of the Medical Act, he is precluded from filing suit until he knows he will be able to secure an expert report within six months. No other cause of action punishes a plaintiff as does the Medical Act—if a plaintiff is unable to file an expert report that proves liability and causation within six months of filing suit, his suit will be dismissed with prejudice and monetary sanctions can be imposed. Thus, fraudulent concealment in a medical malpractice case is completely different from fraudulent concealment in any other case.

The majority opinion states, "A party cannot wait to file suit until his attorney tells him he has a cause of action and thereby avoid limitations." That may generally be true, but I believe the Medical Act changed that rule as it applies to a medical malpractice case.

The provisions of section 13.01 are calculated to cause a plaintiff to delay the filing of a medical malpractice suit until he knows an expert is willing to state under oath that the plaintiff was injured as a result of specific medical malpractice. To do that, the plaintiff must provide the expert with his medical records. The Medical Act requires an expert's report to both identify (1) the manner in which the care rendered by the defendant did not meet the applicable standards of care and (2) the causal relationship between that failure and the injury. TEX.REV.CIV.STAT. art. 4590i, § 13.01(r)(6) (1998). The Medical Act does not permit an expert report to simply rely on a bad result as proof of negligence. *See* TEX .REV.CIV.STAT. art. 4590i, § 7.02(a) (1998) (jury must be informed that negligence cannot be based solely on evidence of bad result).

The panel opinion holds that the plaintiff should have filed suit against the doctors in this case based on nothing more than the bad result of the operation, without any proof of negligence or causation. Yet, if the plaintiff had filed suit before he had any information about negligence, as the panel suggests, he and his lawyer would have risked sanctions.[5] In another type of case, the plaintiff could have filed suit and used discovery to search for evidence of liability and causation. The Medical Act precluded him from using this tactic in his medical malpractice suit.

The summary judgment evidence in this case showed the plaintiff did not even receive the discharge summary from his stay at St. Luke's until two years, five months, and five days after his first surgery. Realistically, he could not have produced an expert report within two years and six months from the date of injury because the defendants engaged in a scheme to hide and alter the plaintiff's medical records.

### Defendants' Duty to Provide Medical Records

This is not, as the majority opinion implies, just another discovery dispute that the plain-

---

4. Even today, the defendants contend they were not required to produce records because they were not negligent. The defendants miss the point entirely. As noted below, they were not required to produce records only if they were negligent; they were required to produce records upon request, separate and apart from any negligence.

5. In footnote two, the panel opinion mistakenly says the plaintiff could have obtained an extension of time to file the expert reports. Section § 13.01(f) specifically prohibits the trial court from granting more than one 30–day extension for filing the expert report outside the time limits provided in section 13.01. *See* TEX.REV.CIV.STAT. art. 4590i, § 13.01(f) (1998). The plaintiff could not have secured additional time by asking for an injunction.

tiff failed to pursue to resolution. The plaintiff and Cigna had a right under two different statutes to copies of the medical records; the defendants had a corresponding duty to provide those records, *regardless of whether a suit was even filed.*

First, the Medical Act entitled both the plaintiff and Cigna to copies of the medical records within ten days of making a request. Section 4.01(d) provides:

> All parties shall be entitled to obtain *complete and unaltered* copies of the claimant's medical records from any other party within 10 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization executed by the claimant herein shall be considered compliance by the claimant with this section.

TEX.REV.CIV.STAT. art. § 4590i, § 4.01(d) (1998) (emphasis added).

Second, under the Worker's Compensation Act, both the plaintiff and Cigna were entitled to copies of the medical records. The provision of the Worker's Compensation Act effective in 1991 was section 4.66(b), which provided:

> A health care facility shall, on request of either the injured employee, the employee's attorney, or the insurance carrier, furnish records pertain to treatment or hospitalization for which compensation is being sought.

*See* TEX.REV.CIV.STAT. art. § 8308–4.66 (repealed),[6] formerly TEX.REV.CIV.STAT. art. 8306, § 7 (repealed).

Under Texas Workers' Compensation Commission's Board Rule 42.30, the health care provider should send a patient's medical records with the invoices it sends to the carrier. Under Board Rule 42.25, the health care provider must submit complete, adequate, and detailed reports when required or requested by the insurance carrier or the claimant. St. Luke's failure to provide the plaintiff and Cigna with complete records violated the Medical Act, the Worker's Com-

pensation Act, and the Workers' Compensation Commission Board Rules.

The plaintiff provided an affidavit of an expert in the area of hospital administration which stated St. Luke's had a legal duty to timely and accurately compile and maintain medical records. If a hospital does not complete a patient's medical records within the time required by the hospital's own by-laws and according to national standards, it is impossible for a patient to determine what treatment he received. *See* St. Luke's Episcopal Hospital Medical Staff Rules & Regulations, approved 5–10–90, p. 9, B–17; Medicare, Part 482—Conditions of Participation for Hospitals, 482.24, Medical Record Services. The medical record of a patient's stay in a hospital is the only record of the care and treatment provided a patient while in the hospital. St. Luke's violated its own internal rules and fell below the national minimum standards.

### Conclusion

This is not a case that the plaintiff and Cigna did not, but should have, realized something went wrong. Both the plaintiff and Cigna immediately realized something went wrong and for more than two years actively sought the records to confirm their suspicions. The defendants refused to provide the records time and time again and fraudulently tampered with the records. Their acts should toll the statute of limitations. To hold otherwise essentially tells health care providers to, as a matter of course, withhold medical records containing indications of negligence until two years and seven months after the botched treatment. Then, any medical malpractice claims arising out of the negligence are effectively barred.

---

6. Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 4.66, 1989 Tex.Gen.Laws 47–8, repealed by Act of May 29, 1993, 73d Leg.R.S., ch. 269, § 1, 1993, Tex.Gen.Laws 987, 990. Now, see TEX.LAB. CODE § 408.025(d).