**Ronnie TEJADA and Rose Tejada as Next Friend of Kelsey Tejada and Kaylie Tejada, Appellants,**

v.

**Virgilio GERNALE, Appellee.**

**No. 01–10–00569–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 11, 2011.

Bryan Adam Terrell, Weller, Green, Toups & Terrell, Beaumont, TX, for Appellants.

Erin L. Leeser, Randall S. Richardson, Fulbright & Jaworski, L.L.P., Houston, TX, Kathleen Marie Kennedy, Mehaffy Weber, Beaumont, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION

JANE BLAND, Justice.

In this medical-malpractice case, Ronnie and Rose Tejada appeal the trial court's summary judgment favoring appellee, Virgilio Gernale, M.D. The Tejadas contend that trial court erred by granting summary judgment because they timely filed their claims within the applicable limitations period, a res judicata defense with respect to an earlier filed federal suit is without merit, and they raised a fact issue that Gernale's negligence proximately caused their injuries. We conclude that (1) Gernale has not conclusively proved that limitations bars his alleged acts of negligence; (2) Gernale was not a party or in privity with a party to the earlier federal case, precluding a judgment based on res judicata; and (3) a fact issue exists as to whether Gernale's negligence caused Tejada's injuries. We therefore reverse and remand for further proceedings.

### Background

From November 2004 to October 2005, Ronnie Tejada was incarcerated in the Jefferson County Jail. During that time, NaphCare, Inc. administered medical care for the inmates under a contract with Jefferson County. NaphCare in turn hired Gernale to provide physician services.

On intake, Tejada reported to NaphCare personnel that, four years before, he had fallen from a height of 45 feet, necessitating the installation of plates in his skull, and that he was blind in his right eye. He reported that he had a personal history of diabetes but that he had no current problems with the disease and was not taking any diabetic medication. Tejada weighed 165 pounds. NaphCare personnel recorded these details in Tejada's medical chart.

In December, Tejada completed a health-services-request form, in which he

complained of a number of loose teeth. A dentist diagnosed him as having periodontal disease; however, Tejada refused any teeth extractions. In January, Tejada explained that a baseball had struck the right side of his head and that the plates on that side were hurting and sore. Tejada also complained of deteriorating vision in his left eye and pain in his left wrist, right hand, and left leg. A physician prescribed naproxen, a pain reliever. In mid-February, Tejada again complained that his plates were hurting and sore, and he requested that his brain surgeon be contacted to treat him.

On February 21, 2005, Gernale reviewed Tejada's chart after a nurse informed him that Tejada had refused the pain reliever. On February 22, Gernale examined Tejada for the first time. Tejada reported that a prior doctor had instructed him not to take any pain medication. Gernale was aware of Tejada's history of diabetes, his head pain, and his recent dental issues. Yet, Gernale did not perform a blood sugar test to determine if Tejada's diabetes was under control. He discharged the pain medicine order and ordered that Tejada not be scheduled for another doctor's appointment unless he was willing to take pain medication.

Three days later, on February 25, Tejada complained of continuing deterioration of vision in his left eye and worsening pain near his skull plates. Two day later, on February 27, Tejada reported having lost between 20 and 25 pounds, and he requested a soft diet.

In early and mid-March, Tejada had two appointments with Gernale. On both occasions, Gernale examined Tejada but did not check Tejada's blood sugar level. In late-March, Gernale ordered Tejada a soft diet, and he referred Tejada to an outside neurologist to address Tejada's head pain. In early April, the outside neurologist refused to see Tejada, saying that Tejada instead needed to see a neurosurgeon. That same day, Gernale signed an order referring Tejada to a neurosurgeon.

In early May, complaining that he was losing too much weight, Tejada requested a double portion of food.

On May 3, a nurse notified Gernale that NaphCare had been unable to find a neurosurgeon who would see Tejada. The next week, Tejada again complained of head pain. On May 5, Gernale ordered the nurses to weigh Tejada and, if he weighed significantly less than 165 pounds, to give him a double-portion diet for the next 90 days. After weighing him, the nurses subsequently placed Tejada on a double-portion diet.

On May 22, Tejada completed another health-services-request form, yet again complaining of head pain. Tejada insisted that he needed help immediately and asked to see his brain surgeon. On May 27, Tejada had his fourth and final appointment with Gernale. Like before, Gernale did not perform a blood sugar test.

On July 12, Gernale conducted a chart review, but he did not meet with Tejada. Citing the inability to find a neurosurgeon willing to accept Tejada because he was an inmate, Gernale cancelled his standing order referring Tejada to a neurosurgeon and ordered that Tejada be sent to the emergency room if an emergency developed. In full, Gernale wrote:

Chart Review Only—[Patient] have not sent [1] any SCR [2] about brain problems—

---

1. In his deposition, Gernale read this word as "seen."

2. In his deposition, Gernale read this abbreviation as "sick per request." Elsewhere, Gernale explained that SC means "sick call." This sentence seems to indicate that Tejada had not sent any additional sick call requests.

Can't get anybody locally to evaluate the patient / was seen by a neurologist but it should have been a neurosurgeon, no neurosurgeon will accept this patient because he is an inmate.

*Plan.* Cancel previous referral to a neurosurgeon, will send [patient] to ER for any emergency situation/concerns.

On October 4, Tejada complained to a nurse that he could not void, was blind, had "right side pain," and had not eaten in four days. On October 5, Tejada was very weak and, when attempting to stand, he fell to the floor. Tejada reported that he had not eaten in five days. Tejada was then transported to the emergency room at St. Elizabeth Hospital, suffering from dehydration and malnutrition. A blood sugar test revealed that he was in a state of severe hyperglycemia, with a blood sugar level of 460 mg/dL. Within a month, doctors amputated both of Tejada's legs below the knees.

In June 2006, the Tejadas filed suit in federal district court against NaphCare, Jefferson County, and others, arising out of his treatment while incarcerated at Jefferson County Jail. In May 2007, the Tejadas moved to join Gernale as an additional defendant, but the federal court denied the Tejadas' motion. A jury later returned a verdict in favor of the federal-court defendants, and the federal court rendered a take-nothing judgment.

Meanwhile, on July 11, 2007, the Tejadas notified Gernale in writing of their health-care-liability claims against him in compliance with Chapter 74 of the Texas Civil Practices and Remedies Code. On September 24, the Tejadas sued Gernale, asserting that he negligently failed to test for, treat, or follow up on Tejada's disclosed diabetes. The Tejadas filed their suit 2 years and 74 days after July 12, 2005, the date Gernale reviewed Tejada's chart and cancelled his order referring Tejada to a neurosurgeon.

The Tejadas' expert, Philip Raskin, an endocrinologist specializing in the treatment of diabetes, testified that Gernale's negligence in failing to diagnose Tejada's diabetes—which could have easily been confirmed with a simple blood sugar test—caused Tejada's injuries.

Gernale then moved for summary judgment, asserting that the statute of limitations and res judicata conclusively bar the Tejadas' claims and that no evidence exists that Gernale's negligence caused Tejada's injuries. Responding to Gernale's motions, the Tejadas attached an affidavit from Raskin. In the affidavit, Raskin stated that Gernale breached the applicable standard of care on July 12, when, after reviewing Tejada's medical chart—a chart revealing that Tejada had a history of diabetes and was then exhibiting a number of severe diabetic symptoms—he failed to order Tejada's blood sugar level be tested and discontinued any follow-up absent presentment to an emergency room. Raskin had testified earlier in his deposition, however, that the last date Gernale "committed medical malpractice" against Tejada was May 5, when Gernale ordered the nurses to weigh Tejada and, if he weighted significantly less than 165 pounds, to give him a double-portion diet for the next 90 days. In light of this testimony, Raskin averred, "After further consideration of the medical records [I realize that] I made [the deposition] statement [regarding the last date of malpractice] in error."

### Standard of Review

An appellate court reviews de novo a trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). A court considers the summary-judgment evidence in the light most favorable to the nonmovant. *Id.* To prevail on a motion for traditional summary judgment, a movant must establish that there is no genuine issue of mate-

rial fact so that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Mann Frankfort Stein*, 289 S.W.3d at 848. After an adequate time for discovery, a party may move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim or defense on which the adverse party bears the burden of proof at trial. TEX.R. CIV. P. 166a(i); *see Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The trial court must grant the motion unless the nonmovant presents more than a scintilla of evidence raising a genuine issue of material fact on each element specified in the motion. TEX.R. CIV. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) ("More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'") (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995)); *Flameout Design*, 994 S.W.2d at 834.

### Statute of Limitations

The Tejadas contend that they filed their claims within the limitations period because July 12 was an ascertainable date on which Gernale committed malpractice by failing to order a blood sugar test or alternatively because it was the last day of a course of treatment. Gernale responds that he did not conduct a patient visit with Tejada on July 12; that, as a matter of law, a physician can breach a standard of care to conduct diagnostic testing only on a date that the physician actually examines the patient in person; and that the July 12 chart review and orders here do not constitute a patient visit. Gernale alternatively responds that the Tejadas' expert's affidavit contradicts the expert's earlier deposition testimony that May 5 was the last date that Gernale committed malpractice.

### A. Limitations Period for Health–Care–Liability Claims

A health-care-liability claim has a two-year limitations period. TEX. CIV. PRAC. & REM.CODE ANN. § 74.251(a) (West 2005). The statute tolls the limitations period for 75 days if the claimant notifies the physician of the claim against the physician in the manner that Chapter 74 requires. *Id.* § 74.051(c) (West 2005); *Rubalcaba v. Kaestner*, 981 S.W.2d 369, 373 (Tex.App.-Houston [1st Dist.] 1998, pet. denied); *see Rowntree v. Hunsucker*, 833 S.W.2d 103, 108 (Tex.1992).[3]

---

**3.** At the outset, the Tejadas contend that, regardless of when it began to run, the limitations period was tolled while the federal suit was pending, pursuant to section 16.064(a) of the Texas Civil Practices and Remedies Code. Section 16.064(a) states:

The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:
(1) because of lack of jurisdiction in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and

(2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.

TEX. CIV. PRAC. & REM. ANN. § 16.064(a) (West 2008). Recognizing that section 16.064 applies to dismissals for a lack of jurisdiction, the Tejadas contend that it nonetheless applies here under *Vale v. Ryan*, 809 S.W.2d 324, 327 (Tex.App.-Austin 1991, no writ) ("[F]or purposes of the applicability of section 16.064, a federal court's refusal to exercise jurisdiction over a pendent state claim is tantamount to a dismissal for lack of jurisdiction."). In *Vale*, the federal court granted the plaintiff's motion for leave to add the additional defendant, against whom she asserted a

We measure the limitations period from (1) the date that the breach or tort occurred, (2) the last date of a course of treatment for a particular condition, or (3) the last date of a hospitalization for which a claim is made. TEX. CIV. PRAC. & REM. CODE ANN. § 74.251(a); *Rowntree*, 833 S.W.2d at 104. If we can ascertain the date the alleged beach or tort occurred, then the limitations period must be measured from that date; inquiry into the second and third potential dates is unnecessary and immaterial. *Id.*

Because the applicable limitations period is 2 years long and tolled for 75 days, we examine the last date that Gernale was involved in Tejada's medical care—July 12, 2005—as the only potential date from which limitations had not run by the time the Tejadas notified Gernale of their claims. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.251(a); *Rubalcaba*, 981 S.W.2d at 373. The Tejadas assert that Gernale was negligent on July 12, 2005, when Gernale reviewed Tejada's chart, discharged his standing order referring Tejada to a neurosurgeon, failed to order a blood sugar test, and ordered that Tejada be sent to the emergency room in an emergency. According to Raskin, on July 12, Tejada's medical chart showed a history of diabetes and a number of severe diabetic symptoms that Tejada was then exhibiting. Raskin opined that an adequate review of a Tejada's medical chart on July 12, 2005—a chart revealing a history and classic symptoms of diabetes—would prompt a reasonably prudent physician to order the patient's blood sugar level be tested to determine if his blood sugar was under control. Raskin concluded that after re-viewing Tejada's medical chart, Gernale breached the applicable standard of care by failing to order Tejada's blood sugar be tested. It is undisputed that on July 12, Gernale possessed the authority to order a nurse or nurse's aide to perform a blood sugar test on Tejada. Instead, Gernale cancelled his order referring Tejada for further medical care and instituted a new plan that ordered that Tejada be taken to an emergency room for any emergent medical needs.

Gernale responds that a physician cannot breach a standard of care to conduct diagnostic testing unless the physician actually examines the patient and thus his July 12 chart review is insufficient to constitute a breach of the standard of care or the last date of a course of treatment. Gernale cites the following cases for support: *Shah v. Moss*, 67 S.W.3d 836, 844–45 (Tex.2001); *Husain v. Khatib*, 964 S.W.2d 918, 919 (Tex.1998); *Bala v. Maxwell*, 909 S.W.2d 889, 892 (Tex.1995); *Chambers v. Conaway*, 883 S.W.2d 156, 159 (Tex.1993); *Rowntree*, 833 S.W.2d at 108; *Streich v. Dougherty*, No. 13–05–00064–CV, 2008 WL 5191309, at *3 (Tex.App.-Corpus Christi Dec. 11, 2008, no pet.).

In *Rowntree*, the plaintiffs alleged that the defendant-physician failed to diagnose a patient's occluded arteries, which led to a debilitating stroke. *Rowntree*, 833 S.W.2d at 103–04. The Texas Supreme Court explained that the physician "could have breached this duty only on those occasions when he had opportunity to perform ... examinations." *Id.* at 108. Thus, "the date of the alleged wrongful act ..., [as] ascertainable from the facts of the case,

state-law claim. *Vale*, 809 S.W.2d at 325 & n. 2 (date motion is filed functions as date of filing for purposes of section 16.064). The federal court subsequently dismissed the state-law claim as it applied to the added defendant but not as to the remaining parties. *Id*. at 325. In contrast, the Tejada's state-law claims were never filed in federal court, and Gernale was never a party to that suit because the federal court refused to grant leave to add Gernale as a defendant. Accordingly, section 16.064 is inapplicable. *See* TEX. CIV. PRAC. & REM. ANN. § 16.064(a).

was the last visit that [the patient] paid to [the physician's] office." *Id.* This was true despite evidence that the patient had called the physician's office for medication refills after her last office visit. *See id.* at 104.

The Tejadas' allegations are distinguishable from *Rowntree* in two respects: First, unlike the necessary examination in *Rowntree*, Gernale could have ordered testing of Tejada's blood sugar upon a review of his chart, even without conducting an in-person patient examination. Second, unlike a prescription refill, which continues a prescribed course of treatment, on July 12, Gernale reviewed Tejada's then-existing medical condition, and he instituted a new "plan" of treatment—to discontinue planned, additional medical follow up of Tejada's complaints absent an emergency.

In *Chambers*, the plaintiffs alleged that the defendant—physician negligently failed to diagnose a patient's breast cancer after initial testing indicated that her lump was benign. 883 S.W.2d at 157. The Texas Supreme Court explained that a physician may be liable for a failure to diagnose a condition "up to the last appointment between them," even if that appointment was unrelated to the negligence claim but that the limitations period could not toll indefinitely until discovery of the condition. *Id.* at 157–58. In contrast to the July 12 chart review here, the plaintiffs in *Chambers* did not allege that the physician undertook any medical diagnosis or developed any plan of treatment after the last office visit. *See id.* at 156.

In *Bala*, the plaintiffs alleged that the defendant—physician negligently failed to diagnose a patient's cancer. *See* 909 S.W.2d at 890. The Texas Supreme Court held that the physician's negligent failure to conduct follow-up procedures could have occurred in connection only with patient examinations before the examination that led to the proper diagnosis. *Id.* at 892.

As in *Chambers*, and unlike the present case, there was no allegation that the physician's negligence stemmed from anything other than a patient visit because no other evidence of medical decision-making existed in the record. *See id.*

In *Husain*, the plaintiffs alleged that the defendant-physician was negligent by not taking actions that would have lead to earlier discovery of the patient's cancer. 964 S.W.2d at 919. The Texas Supreme Court explained that "[t]hose events, or non-events, occurred on specific ascertainable dates: January 25, 1990, and September 26, 1991." *Id.* at 920. On January 25, the physician spoke with the patient to inform her of the results of a prior mammogram, and the physician referred the patient to another physician. *Id.* at 919. *Husain* suggests that a physician can breach a duty to perform follow-up tests on a specific date even without an in-person patient visit if the claim alleges an error in the medical judgment related to the physician's medical diagnosis or plan of care executed on a given day. *See also Garrett v. Harris County Hosp. Dist.*, No. 01–07–00836–CV, 2008 WL 3522258, at *3 (Tex.App.-Houston [1st Dist.] Aug. 14, 2008, no pet.) (mem. op.) (hospital "breached its duty to disclose [the patient's] biopsy results by failing to communicate the results reasonably promptly after obtaining them").

In *Shah*, the plaintiff-patient alleged that the defendant—physician negligently failed to provide weekly or monthly follow-up visits after performing surgery on his eye. 67 S.W.3d at 844. The *Shah* court held that limitations ran from the last follow-up visit actually conducted, not from the last office visit—a routine yearly eye exam—which occurred a year later. *Shah*, 67 S.W.3d at 845. The court explained that this conclusion was compelled by the standard of care as alleged by the patient's

expert, which required follow up at a much earlier time to prevent the injury alleged. *See id.*

In pinning the limitations period to the last office visit, Gernale suggests that reasonable minds could not disagree about the character of his July 12 chart review and order. We disagree. Some evidence exists that, on July 12, when Gernale reviewed Tejada's medical condition, he changed his "plan" of treatment for Tejada—discharging his standing order referring Tejada to a neurosurgeon—and ordered Tejada be sent to the emergency room only in an emergency, without ordering any testing of Tejada's blood sugar despite worsening charted symptoms consistent with diabetes. We hold that that the Tejada's suit alleges acts of medical negligence on July 12, 2005, a readily ascertainable date within the limitations period; thus, the record does not support summary judgment based on the statute of limitations.

## B. Summary–Judgment Evidence

■ Finally, Gernale contends that we must disregard Raskin's affidavit as a "sham" affidavit supporting a fact issue on limitations when compared with Raskin's earlier deposition testimony about the "last date" of medical malpractice. Raskin testified in his deposition that the last date malpractice occurred was May 5, the date Gernale ordered a double-portion diet for Tejada if he weighed significantly less than 165 pounds without checking his blood sugar level. Raskin's later affidavit sets forth negligent acts on July 12, the chart-review date.

■ A statement in an affidavit fails to raise a genuine issue of material fact if (1) the statement clearly contradicts the affiant's earlier deposition testimony on a material point, (2) the affidavit is executed after the deposition was taken, and (3) the affidavit fails to explain the reason for the change. *Pando v. Sw. Convenience*

*Stores, L.L.C.,* 242 S.W.3d 76, 79 (Tex. App.-Eastland 2007, no pet.); *Eslon Thermoplastics v. Dynamic Sys., Inc.,* 49 S.W.3d 891, 901 (Tex.App.-Austin 2001, no pet.); *Farroux v. Denny's Rests., Inc.,* 962 S.W.2d 108, 111 (Tex.App.-Houston [1st Dist.] 1997, no pet.). Raskin's affidavit explains the difference between his deposition testimony and his affidavit regarding the last date of malpractice: "After further consideration of the medical records [I realize that] I made [the deposition] statement in error." In *Farroux,* this Court explained, "For example, an affiant could explain that he was confused in a deposition, or that he discovered additional, relevant materials after the deposition." *See Farroux,* 962 S.W.2d at 111 n. 1. We note that the trial court did not strike Raskin's affidavit as a sham. Given that the trial court considered the affidavit as summary-judgment evidence and Raskin proffered an explanation for the change, we decline to strike the affidavit on appeal.

## Res Judicata

Gernale next contends that (1) the Tejadas' state-law claims concerns the same nucleus of operative facts as the claims litigated in the federal action, (2) the Tejadas could have asserted their state-law claims in federal court under the court's pendant jurisdiction, and (3) privity exists between himself and NaphCare because NaphCare adequately represented his interests in the federal action so as to be his "virtual representative."

### A. Applicable Law

■ The claim-preclusive effect of a federal-court judgment on a federal-question claim is determined by federal res judicata principles. *Semtek Int'l. Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 507, 121 S.Ct. 1021, 1027, 149 L.Ed.2d 32 (2001); *see John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d

268, 287 (Tex.2002). Under the doctrine of res judicata, a party is precluded from litigating a claim in a pending action if (1) in a previous action, a court of competent jurisdiction rendered a final judgment on the merits of a claim, (2) the parties that litigated the prior claim are identical to or in privity with the parties litigating the pending claim, and (3) the pending claim (a) is identical to the prior claim or (b) arises out of the same nucleus of operative facts as did the prior claim and could have been litigated in the previous action. *In re Paige*, 610 F.3d 865, 870–72 (5th Cir.2010); *see also Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1173 (5th Cir.1992) ("A non-party defendant can assert res judicata so long as it is in 'privity' with the named defendant."). For res judicata purposes, "privity" exists if (1) a nonparty agrees to be bound by the determination of issues in an action between others; (2) a pre-existing substantive legal relationship governs a nonparty and a party to a judgment; (3) a party with the same interests adequately represents a nonparty in a prior action; (4) a nonparty assumes control over the litigation in the prior action; (5) a nonparty serves as proxy for a party to a prior action; or (6) a special statutory scheme expressly forecloses successive litigation by nonlitigants and claim preclusion is otherwise consistent with due process. *Taylor v. Sturgell*, 553 U.S. 880, 893–95, 128 S.Ct. 2161, 2172–73, 171 L.Ed.2d 155 (2008); *id.* at 885, 128 S.Ct. at 2167 (disapproving of doctrine of "virtual representation").

### B. Analysis

■ The Tejadas premised their federal-law claims against NaphCare on allegations that it acted with deliberate indifference to Tejada's medical and nutritional needs, including depriving him of adequate medical treatment. Gernale contends that his interests could have been adequately represented by NaphCare in the prior suit.

He concludes that both he and NaphCare had a shared interest to provide appropriate care and, thus, to defend that care against claims of negligence. But Gernale has failed to show that NaphCare understood itself to be acting in any representative capacity or that the federal district court viewed anyone as representing or protecting Gernale's interests. *See id.* at 900, 128 S.Ct. at 2176 ("A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned, and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty.") (internal citations omitted). Additionally, nothing indicates that the federal-court judgment, if unfavorable, would have bound Gernale. Accordingly, we hold that Gernale failed to show that he is entitled to judgment as a matter of law on his affirmative defense of res judicata.

### Evidence of Causation

In his motion for no-evidence summary judgment, Gernale asserted that there was no evidence of the causation-in-fact element of proximate cause. The Tejadas contend that summary judgment on this basis is improper, because they have raised some evidence that Gernale's negligence caused Tejada's injuries.

### A. Applicable Law

■ In a medical malpractice case, the plaintiff must prove that (1) the defendant owed him a duty to act according to an applicable standard of care, (2) the defendant breached the applicable standard of care, (3) he suffered an injury, and (4) within a reasonably medical probability, the defendant's breach proximately caused his injury. *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 205 (Tex.App.-Houston [1st Dist.] 2010, no

pet.). Proximate cause has two components: causation in fact and foreseeability. *W. Invs. Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred." *Id.* Evidence that shows only that the defendant's negligence furnished a condition that made the injuries possible is insufficient to show proximate cause. *Id.* Proximate cause cannot be established by mere conjecture, guess, or speculation. *Id.* In a medical malpractice case, proximate cause must be established through expert testimony. *Robins,* 321 S.W.3d at 205.

**B. Analysis**

■ Raskin opined that Tejada suffered from diabetes during the duration of his incarceration at Jefferson County Jail based on Tejada's then-existing symptoms and past medical history. Upon being transferred to St. Elizabeth's hospital, Tejada suffered from severe hyperglycemia, with a blood sugar level of 460mg/dL. Tejada was in a state of diabetic ketoacidosis, which Raskin explained meant that his body was burning fat because it did not have any insulin. Raskin explained that a blood sugar test would have confirmed a diabetic diagnosis. Less than two weeks later, Tejada had developed progressive ischemia (lack of blood) and gangrene (tissue death) in his left leg. Raskin testified[4] that Tejada's untreated diabetes caused the ischemia and gangrene and weakened his immune system, rendering him susceptible to infection, sepsis, and pneumonia. Raskin testified that in his opinion, based on a medical probability, the cause of Tejada's amputations was uncontrolled diabetes. Raskin further testi-

fied that intervention at any point during Tejada's incarceration would have averted the outcome of amputation. Raskin concluded, "If Tejada had been diagnosed with diabetes and properly treated and/or referred to the proper physicians, it is my opinion, within a reasonable degree of medical probability, that the ischemia, gangrene, the lack of oxygen below both of Mr. Tejada's knees, and eventual bilateral amputation of his legs would not have occurred."

Based on Raskin's expert opinion, we conclude that the Tejadas have raised a fact issue as to whether, in developing the July 12 plan of treatment, Gernale's alleged failure to properly evaluate Tejada's worsening symptoms, order a blood sugar test, or institute a treatment plan that accorded with a reasonable standard of care for patients with diabetes, caused Tejada's injuries. Thus, the trial court's summary judgment does not stand on this basis.

**Conclusion**

Because Gernale has failed to show that his affirmative defenses of limitations and res judicata bar the Tejadas' claims, and some evidence exists to show that Gernale's alleged acts of negligence caused Tejada's injuries, we conclude that the record does not support the trial court's summary judgment. We therefore reverse that judgment, and remand for further proceedings.

---

4. During his deposition, Raskin testified that his testimony from the prior trial and his experts reports accurately reflect his opinion concerning Gernale's malpractice. Gernale did not object to the Tejadas' use of Raskin's prior testimony or his expert reports as summary-judgment evidence.